United States District Court
For the Northern District of California

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re Verisign Corporation Securities Litigation
_________________________________/

NO. C 02-02270 JW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS; DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO STRIKE AND MOTION TO SHORTEN THE CLASS PERIOD**

I. INTRODUCTION

Plaintiffs initiated this securities class action lawsuit on behalf of themselves and of a proposed class of persons and entities that acquired VeriSign Corporation's ("VeriSign") common stock, against VeriSign and four of its executives (collectively, the "Defendants"), for violations of sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission Rule 10b-5. Presently before this Court are Defendants' Motion for Judgment on the Pleadings, Motion to Strike, and Motion to Shorten the Class Period. The basis for these motions rests in the recent Supreme Court decision in Dura Pharms., Inc. v. Broudo, 125 S.Ct. 1627 (2005). The motions were noticed for hearing on September 26, 2005. The Court finds it appropriate to take the motions under submission for decision without a hearing, pursuant to Civil Local Rule 7.1(b). For the reasons set forth below, this Court GRANTS in Part and DENIES in Part Defendants' motion for judgment on the pleadings,

United States District Court
For the Northern District of California

and denies without prejudice the motions to strike and to shorten the class period.

II. BACKGROUND

Plaintiffs, on behalf of themselves and a proposed class of persons and entities that purchased or acquired Verisign Corporation's stock, filed an action against Verisign Corporation and four of its officers and directors, for violations of the Securities Act, the Securities Exchange Act, and Rule 10b-5. VeriSign is a leader in providing Internet "trust services"--services that verify and authenticate information transmitted over the Internet. Such services enable consumers to safely transmit personal financial information (such as credit card numbers) over the Internet to complete commercial transactions.

On March 7, 2000, VeriSign announced that it would issue $21 billion in new stock to acquire Network Solutions, Inc. ("Network Solutions") and turn it into a wholly-owned subsidiary. Network Solutions operated the official registry of Internet domain names, such that anyone who wanted to register a website under the .com, .net, or .org domains had to register through Network Solutions. Network Solutions charged each website listed on its registry at least $6 per year. Although some industry analysts supported this acquisition, others questioned whether VeriSign was paying too much. This skepticism allegedly placed pressure on VeriSign "to show that it was growing at a rate greater than could have been realized by either VeriSign or Network Solutions as a stand-alone company." Consolidated Second Amended Complaint at 2:3-5.

Not long after VeriSign acquired Network Solutions, the Internet boom "went bust." VeriSign's business was hit and the demand for Internet "trust services" and for new Internet domain names declined. VeriSign's stock price fell from $196 per share (on the day it acquired Network Solutions) to $75 per share (on January 24, 2001, the day before the Class Period).

Thereafter, Defendants allegedly employed "an assortment of schemes, artifices, and devices to mislead investors about both the amount and source of revenues earned by [VeriSign]." Consolidated Second Amended Complaint at 2:19-20. In particular, Plaintiffs allege that Defendants artificially inflated VeriSign's earnings--and stock price--via improper reporting and accounting

United States District Court
For the Northern District of California

practices. For example, Plaintiffs allege that Defendants inflated VeriSign's earnings by improperly reporting revenue generated from "round trip" transactions. "Round trip" transactions are transactions wherein VeriSign would invest cash in small, private, start- up businesses ("affiliates") that otherwise could not afford VeriSign's services. In exchange for VeriSign's investment, the affiliates would purchase VeriSign's products/services. VeriSign, in turn, would report these purchases as revenue. Plaintiffs also allege that Defendants artificially inflated VeriSign's earnings by improperly accounting for VeriSign's investments in affiliates. Consolidated Second Amended Complaint at 2,3. VeriSign used an accounting method known as the "cost method" to account for its investments in its affiliates. The "cost method" permitted VeriSign to report at least $12 million in revenues on its financial statements during the Class Period. Id. However, Plaintiffs allege that the "equity method"--not the "cost method"--was the proper method of accounting for VeriSign's investments in affiliates. Id. According to Plaintiffs, the "equity method" is proper when an investor exerts " significant influence" over its investments. Because Plaintiffs claim that VeriSign exerted "significant influence" over its affiliates, Plaintiffs claim that the "equity method" was proper. Id. The "equity method" would not have permitted VeriSign to report any of the revenues received from its affiliates. Plaintiffs allege even further that Defendants artificially inflated VeriSign's earnings by improperly encouraging VeriSign's sales force to engage in a process known as "scrubbing." Consolidated Second Amended Complaint at 4. "Scrubbing" is a method of double-counting: salespersons in one division would report their own sales and the sales of other salespersons in other departments, as if they were their own. Id.

Plaintiffs claim that these practices and others led VeriSign to issue materially false and misleading statements about VeriSign's financial status. Defendants allegedly knew that its business was flagging, yet it continued to artificially inflate VeriSign's revenues. Plaintiffs contend that they relied upon these misrepresentations to their detriment.

Currently before this Court is Defendants' Motion for Judgment on the Pleadings, Motion to Strike, and Motion to Shorten the Class Period. Defendants contend that Plaintiffs have not met their

United States District Court
For the Northern District of California

burden of adequately pleading loss causation, as set forth by the Supreme Court in the recent Dura Pharm Inc., decision. Dura Pharm., Inc. v. Broudo, 125 S.Ct. 1627 (U.S. 2005).

III. STANDARDS

In ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court applies the same standard as ruling on a motion to dismiss pursuant to Rule 12(b)(6). See 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 (2005). Under Rule 12(c), after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. Pro. 12(c). In ruling on a motion to dismiss, the court must accept as true all allegations of material fact and must construe said allegations in the light most favorable to the non-moving party. Western Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985). Any existing ambiguities must be resolved in favor of the pleading. Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts stated under a cognizable theory. Moran, supra at 893; 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed. 1982); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984). In order to grant a motion to dismiss, it must appear to a certainty that a plaintiff would not be entitled to relief under any set of facts which could be proved. Rothman v. Vedder Park Management, 912 F.2d 315, 316 (1990).

IV. DISCUSSION

**A. Loss Causation Under Dura**

Section 10b of the Securities Exchange Act of 1934 forbids (1) the "use or employment" of any "deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 forbids the making of any "untrue statement of material fact," or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240. 10b-5(b). Congress imposed additional statutory requirements on such a private action, when it

passed into law, the Private Securities Litigation Reform Act (" PSLRA"). 15 U.S.C. § 78u-4(b) (1)-(2). Under the PSLRA, a plaintiff must (1) specify "each statement alleged to have been misleading and the reason why the statement is misleading," and (2) allege "facts giving rise to a strong inference that the Defendant acted with the required state of mind." Id. A plaintiff alleging fraud is also required to show loss causation, i.e., the plaintiff must prove that defendants' securities fraud caused economic loss. Id.

The Supreme Court, in a recent decision, clarified this loss causation pleading and proof requirement for securities fraud cases. Dura Pharm., Inc. v. Broudo, 125 S.Ct. 1627 (U.S. 2005). Loss causation, as defined by the Supreme Court, is the "causal connection between the material misrepresentation and the loss." Id. at 1631. The Court, in Dura, held that a plaintiff could not satisfy loss causation merely by alleging (and later establishing) that the price of the securities on the date of the purchase was inflated because of misrepresentation. Id. at1627. In Dura, plaintiffs were a class of individuals who purchased stock in Dura Pharmaceuticals on the public market during the class period. Plaintiffs alleged that the company made false statements concerning its profits and its prospects for future approval by the FDA of its products before and during the purchase period. Id. at 1630. However, on the last day of the purchase period, Dura Pharmaceuticals announced that its earnings would be lower than previously expected, principally due to slow drug sales. Id. The following day, the company's shares lost almost half their value, falling from $39 per share to $21 per share. Id. Subsequently, when Dura Pharmaceuticals announced that the FDA would not approve its products, the company's shares temporarily fell but almost fully recovered within one week. Id. With respect to economic loss, the complaint alleged that "[i]n reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for Dura securities" and the "plaintiffs suffered 'damage[s]' thereby." Id. In reversing the Ninth Circuit's jurisprudence on loss causation, the Dura Court stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss" because the injury does not necessarily occur at the time of the purchase. Id. at 1631-32. For instance, where plaintiffs sold their stock immediately after purchasing it at an inflated price,

before the truth was disclosed to the market, the plaintiffs may have suffered no economic loss at all. Id. at 1631. In concluding that plaintiffs did not adequately plead loss causation, the Supreme Court held that, in light of the numerous factors affecting share price an inflated purchase price might suggest that the misrepresentation "touches upon" a later economic loss, but could not be held to have "caused" the economic loss. Id. at 1632. Although the Supreme Court also noted that its holding did not affect the applicability of Fed.R.Civ.P. 8(a)(2) to loss causation (i.e., its holding did not create a heightened pleading standard for loss causation), the mere allegation that plaintiffs' class purchased their shares at an artificially inflated price did not serve to place the defendant with "fair notice of what the Plaintiff's claim is and the grounds upon which it rests." Id. at 1634 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Even under this test, plaintiffs' complaint failed to "provide the defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Id. at 1634. Specifically, the Court found that the complaint (1) failed to state that Dura's share price fell significantly after the truth became known, (2) failed to specify the relevant economic loss, and (3) failed to describe the causal connection between the loss and the misrepresentation. Id. at 1634.

Applying the Dura framework, the Ninth Circuit recognized that pleading loss causation is a difficult task. In re Daou Systems, Inc., 411 F.3d 1006, 1014 (9th Cir. 2005). The Daou Court, however, specified that a plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation. Id. at 1025. As long as the misrepresentation is a substantial cause of the investment's decline in value, recovery will not be barred. Id. In Daou, plaintiffs, a class of former investors, purchased Daou common stock between February 13, 1997 and October 28, 1998. Plaintiffs alleged that defendants systematically and frequently violated the Generally Accepted Accounting Principles ("GAAP") by prematurely recognizing revenue in order to artificially inflate the price of Daou stock; and that in relying on these prices, plaintiffs suffered substantial personal losses. Plaintiffs also alleged that if they had known of Daou's true financial results and conditions, they would not have purchased the shares, at least not at the inflated prices. Id. The Daou court held that the complaint adequately pled loss causation by

United States District Court
For the Northern District of California

showing that the price of Daou's stock fell precipitously after the defendants began to reveal figures showing the company's true financial condition. Id. at 1025-26. The court found that the allegations, if assumed true, were sufficient to provide the defendant "with some indication that the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." Id. at 1026. The court relied on the plaintiffs' allegation that "beginning in August 1998, the company disclosed that its operating expenses and margins were deteriorating and, on October 28, 1998, defendants revealed that Daou had dramatically missed its projected 3Q98 earnings and would have to report a loss of $0.17 a share." Id. The complaint also alleged that defendants revealed that "the Company's rapidly escalating work in progress account represented over $10 million in un-billed receivables--*the direct result of prematurely recognizing revenue*." Id. (emphasis in the original). The Ninth Circuit found these allegations sufficiently specific to establish loss causation under Dura.

Interpreting Dura, some courts have required some "corrective disclosure" before inflated purchase price can constitute evidence of loss causation. In In re Initial Public Offering Sec. Litig., No. MDL 1554(SAS), 2005 WL 1162445 (S.D.N.Y. May 6, 2005) (hereinafter "IPO"), the court stated that, in the Second Circuit, "to establish loss causation, a plaintiff must allege... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at *3 (internal quotations omitted) (emphasis in original). The plaintiffs in that case alleged that the defendants intentionally discounted earnings estimates and issued cautionary statements to excite the market and inflate prices when those estimates were beaten. Id. The IPO court held that the plaintiffs failed to allege loss causation because the defendants' fraudulent scheme was never disclosed to the market. Id.

Relying on th IPO decision, Defendants in the present action contend that Dura requires Plaintiffs to allege some "corrective disclosure" before they can satisfy the requirements for pleading loss causation. They interpret Dura as requiring evidence of "corrective disclosure' to satisfy loss

causation. Defendants' reply at 6.

Notably, the Dura decision itself does not define the pleading standard for loss causation. The Dura decision only speaks in terms of the "truth" and "relevant truth." The Dura court noted that its holding did not affect the applicability of Fed.R.Civ.P. 8(a)(2) to loss causation, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Dura, 125 S.Ct. at 1634. The complaint must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. In satisfying this pleading standard, the complaint needs to"provide the defendant with *some indication* of the loss and the causal connection that the plaintiff has in mind." Id. at 1634 (emphasis added). Similarly in Daou, the court found that the complaint sufficiently alleged loss causation because the complaint provided the defendant "with *some indication* that the drop in Daou's stock price was causally related to Daou's financial misstatements." Daou, 411 F.3d at 1026 (emphasis added).

**B. Plaintiffs Adequately Plead Loss Causation For One Of The Five Categories of Fraud**

Plaintiffs allege that Defendants issued numerous misrepresentations and omissions, causing VeriSign's stock prices to be artificially inflated during the class period. Consolidated Second Amended Complaint at 2. The misstatements and omissions alleged in Plaintiffs' second amended complaint primarily fall into five categories: (1) improper revenue recognition of reciprocal and related party transactions, (2) failure to timely write down alleged impaired assets, (3) improper accounting, (4) false segment reporting, and (5) upwards revision of sales data. Id. at 2. Specifically, Plaintiffs contend that VeriSign recognized at least $27 million from transactions in which VeriSign bartered its products and services for those of other companies, and recognized at least $10.5 million in reciprocal transactions in which it licensed its software to other companies at or about the same time it was purchasing goods and services from these companies. Consolidated Second Amended Complaint at 3. Second, Plaintiffs allege that VeriSign violated GAAP provisions by failing to timely record a $74 million write down to reflect an impairment in its investments in startup companies. Id. In the third category, Plaintiffs allege that VeriSign used improper accounting principles to report at

United States District Court
For the Northern District of California

least $12 million in revenues. Id. In the fourth category, Plaintiffs allege that VeriSign segmented its revenue and earnings by reference to the type of customer from whom the revenues were derived, rather than the type of service which was the basis for the revenue, and that revenues from one VeriSign division were "scrubbed" or transferred to another. Id. at 4. Finally, Plaintiffs allege that VeriSign took sales data that was reported from regional sales divisions and fraudulently inflated them. Id. at 4. All of the above alleged misstatements were purportedly made by Defendants through various press releases and revenue reports issued during the period from January 2001 to March 2002. Consolidated Second Amended Complaint at 19, 23, 25, 28. Plaintiffs contend that by reporting incorrect revenue results, VeriSign's press reports falsely portrayed the corporation as being financially secure.

As discussed above, Plaintiffs must show loss causation before they can prevail on their claim for securities fraud. To establish loss causation, Plaintiffs rely on three disclosures, including: (1) a February 6, 2002 Bloomberg report, (2) a March 19, 2002 report issued by VeriSign, and (3) an April 25, 2002 press release disclosing earnings for 1Q02.

The Bloomberg report simply stated that "VeriSign shares fell 9.5 percent on the concern that revenue at the manager of the database of dot-com web addresses may be inflated by sales to affiliated companies." (Plaintiffs' CSAC at 38.) Plaintiffs allege that this Bloomberg report caused "market speculation" about inflated sales and resulted in a price drop. On March 19, 2002, VeriSign filed its report on Form 10K for its FY01. Consolidated Second Amended Complaint at 38. In this report, the company, for the first time, revealed that approximately 10% of its revenue was attributable to reciprocal arrangements, or "barter transactions," and sales to the company affiliates that VeriSign had just invested in. Id. After the issuance of this report, VeriSign stock dropped 10%, to close at $26.42. Id. This disclosure is particularly pertinent to the first category of fraud, namely that Defendants' engagement in improper revenue recognition of reciprocal and related party transaction. Plaintiffs allege that Defendants inflated earnings by improperly reporting more than $64 million of revenue as a result of numerous "round trip" transactions with its affiliates and other small private companies in

United States District Court
For the Northern District of California

which VeriSign had invested in order to provide them with a source of funds to purchase products from VeriSign. Consolidated Second Amended Complaint at 3. Additionally, VeriSign allegedly improperly reported at least $27 million in cash revenues based on non-monetary barter transactions, in which VeriSign provided domain names, digital certificates or other products to third parties in exchange for their products or services. Id. With regard to these specific allegations constituting the first category of fraud, the Court finds that Plaintiffs have sufficiently pled loss causation.

On April 25, 2000, VeriSign reported its 1Q02 results. (Plaintiffs' CSAC at 40.) VeriSign's ProForma net income dropped $4.1 million, from $71.8 in December 2001 to $67.7 in March, 2002. Id. Stating that "our first quarter results were not up to our expectations as we encountered significant spending delays in our IT and telecom customer bases," Mr. Stratton Sclavos, Chairman and CEO of VeriSign announced plans to restructure the company's operations to fully rationalize, integrate and align the resources of the company. Id. at 41. The Chairman anticipated charges of $70 - $80 million as a result of such restructuring. Id. On this news, VeriSign stock dropped from $18.24 to $9.89 per share.

Plaintiffs contend that the April 25, 2000, disclosure caused a third economic loss for them. However, the April 25 disclosure is not linked to any misstatements alleged in the complaint. Plaintiffs' complaint essentially admits as much. Specifically, Plaintiffs allege: "Even this disclosure, however, did not acknowledge that VeriSign had been maintaining its revenue and earnings numbers by manipulating its financial results." (Plaintiffs' CSAC at 2.) In contrast to Daou, where the complaint alleged deteriorating operating and expense margins, dramatically misplaced revenue results, and a revelation that the company's rapidly escalating work in progress account represented over $10 million in un-billed receivables, Plaintiffs' complaint in this case does not plead any specific disclosure made by VeriSign on April 25, 2000, as being the substantial cause for the decline in stock price. As such, Plaintiffs' complaint fails to provide Defendants with notice of what the causal connection might be between their loss and the vast majority of alleged misrepresentations making up the second through fifth categories of fraud. Dura Pharm., Inc. v. Broudo, 125 S.Ct. 1634

United States District Court
For the Northern District of California

(U.S. 2005).

In summary, Plaintiffs adequately plead loss causation as to the first category of fraud, namely, allegations regarding misstatements and omissions of improper revenue recognition of reciprocal and related party transactions. However, the three disclosures cited by the Plaintiffs in their complaint do not satisfy the causal link requirement as to the other four categories of fraud alleged by Plaintiffs. This Court therefore, grants Defendants' motion for judgment on the pleadings with respect to category one of the alleged fraud and denies the motion with respect to the remaining four categories of fraud.

**C. Plaintiffs' Request for Leave to Amend Complaint is Granted**.

Plaintiffs request leave to amend the complaint if the Court grants Defendants' Motion for Judgment on the Pleadings. Plaintiffs' Motion at 3. Defendants' briefs do not address Plaintiffs' request.

Rule 15(a), Fed. R. Civ. P., provides that a party may amend his pleadings once as a matter of course at any time before a responsive pleading is served. Otherwise a party may amend only by leave of court or by written consent of the adverse party. Id. Rule 15(a) further provides that leave shall be freely given when justice so requires. Federal policy strongly favors determination of cases on their merits and amendments to pleadings should be allowed with "extreme liberality." United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981).

In light of the liberal policy in favor of allowing amendments, this Court GRANTS Plaintiffs' request to amend their complaint. Plaintiffs shall file and serve an amended complaint on or before November 18, 2005.

**D. Defendants' Motions to Strike and to Shorten Class Period Are Denied Without Prejudice**

Defendants contend that Plaintiffs do not allege loss causation with respect to any alleged economic loss after March 19, 2000, and therefore move to strike all alleged misstatements or omissions for which Plaintiffs fail to plead loss causation, and to shorten the class period to end on March 19, 2000. Defendants contend that because Plaintiffs fail to adequately plead loss causation, their allegations qualify as "immaterial, redundant, impertinent, or scandalous."

Generally, a motion to strike must be made before responding to the challenged pleading. Fed. R. Civ. P. 12(f). However, Rule 12(f) allows a court to exercise its discretion, at any time, to strike parts of the pleading that the court deems "an insufficient defense or redundant, immaterial, impertinent, or scandalous matter." Id.

In section "C" immediately above, this Court granted Plaintiffs' request for leave to amend their complaint to adequately plead loss causation. Therefore, this Court does not deem it necessary at this time, to Rule on the merits of Defendants' motion to strike and to shorten the Class Period. Defendants' Motions to Shorten the Class Period and to Strike the complaint are DENIED without prejudice.

V. CONCLUSION

For the reasons stated above, Defendants' Motion for Judgment on the Pleadings is GRANTED in part and DENIED in part with leave to amend. Plaintiffs shall file and serve an amended complaint on or before November 18, 2005. Defendants' Motions to Strike and to Shorten the Class Period are DENIED without prejudice.

Dated: October 28, 2005

02cv2270jop

JAMES WARE
United States District Judge

United States District Court
For the Northern District of California

THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:

Adam T. Savett asavett@cmht.com
Alfred Glenn Yates yateslaw@aol.com
Amy Freeman afreeman@omm.com
Andrew M. Schatz aschatz@snlaw.net
Christopher T. Heffelfinger cheffelfinger@bermanesq.com
Darren J. Robbins e_file_sd@lerachlaw.com
David Malcolm Furbush dfurbush@omm.com
Deborah R. Gross debbie@bernardmgross.com
Dennis J. Herman dennish@mwbhl.com
Dhaivat H. Shah dshah@omm.com
Ioana Petrou ipetrou@omm.com
Jeffrey W. Lawrence jeffreyl@lerachlaw.com
Jessica Anne Hoogs jhoogs@omm.com
Joshua Seth Devore jdevore@cmht.com
Lori E. Romley lromley@omm.com
Marc L. Godino service@braunlawgroup.com
Mark Wayne Robertson mrobertson@omm.com
Meredith N. Landy mlandy@omm.com
Noah Daniel Boyens nboyens@omm.com
Patrick J. Coughlin patc@mwbhl.com
Randi D. Bandman randib@mwbhl.com
Shana Eve Scarlett shanas@milberg.com
Shirley H. Huang shirleyh@mwbhl.com
William S. Lerach billl@lerachlaw.com

Simon Bahne Paris
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

**Dated: October 31, 2005** **Richard W. Wieking, Clerk**

**By: /s/JW Chambers______**
**Ronald L. Davis**
**Courtroom Deputy**