LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
JEFFREY W. LAWRENCE (166806)
DENNIS J. HERMAN (220163)
CHRISTOPHER P. SEEFER (201197)
SHIRLEY H. HUANG (206854)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone: 415/288-4545
415/288-4534 (fax)
PatC@lerachlaw.com
JeffreyL@lerachlaw.com
DennisH@lerachlaw.com
ChrisS@lerachlaw.com
ShirleyH@lerachlaw.com
        – and –
WILLIAM S. LERACH (68581)
JOY ANN BULL (138009)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
BillL@lerachlaw.com
JoyB@lerachlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re VERISIGN, INC. SECURITIES LITIGATION | Master File No. C-02-2270-JW(PVT) |
| This Document Relates To:<br><br>    ALL ACTIONS. | CLASS ACTION<br><br>DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF LEAD PLAINTIFFS' APPLICATION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; AND AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES<br><br>DATE:          March 12, 2007<br>TIME:          9:00 a.m.<br>COURTROOM:  The Honorable James Ware |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   HISTORY OF THE ACTION .................................................................................4

    A.    Summary of Lead Plaintiffs' Claims Alleged in the Consolidated
      Amended Complaint and Subsequent Complaints ...................................4

    B.    The Parties ...............................................................................................6

    C.    The Commencement of the Action; Consolidation and the Appointment of
      Lead Plaintiffs.........................................................................................6

    D.    Lead Plaintiffs' Consolidated Complaint and Defendants' Motion to
      Dismiss....................................................................................................7

    E.    Lead Plaintiffs' Second Amended Complaint and Defendants' Motion to
      Dismiss....................................................................................................8

    F.    Lead Plaintiffs' Third Amended Complaint and Defendants' Motion to
      Dismiss....................................................................................................8

    G.    Lead Plaintiffs' Fourth Amended Complaint and Defendants' Motion to
      Dismiss..................................................................................................11

    H.    Lead Plaintiffs' Fifth Amended Complaint and Defendants' Motion to
      Dismiss..................................................................................................11

    I.    Lead Plaintiffs' Experts, Consultants, and Investigators .......................12

    J.    Lead Plaintiffs' Formal Discovery.........................................................13

        1.    Initial Disclosures ......................................................................13

        2.    Document Requests Propounded by Lead Plaintiffs ....................14

        3.    Depositions Taken by Lead Plaintiffs.........................................15

        4.    Third-Party Discovery Taken by Lead Plaintiffs.........................16

    K.    Defendants' Formal Discovery ...............................................................17

    L.    Discovery Motions.................................................................................18

    M.    Class Certification and Related Motion ..................................................22

III.  SUMMARY OF EVIDENCE OBTAINED IN DISCOVERY .........................23

IV.   SETTLEMENT DISCUSSIONS ...........................................................................25

V.    REASONS FOR THE SETTLEMENT .................................................................25

**Page**

VI.    THE PLAN OF ALLOCATION ..................................................................................27

VII.   THE FEE APPLICATION ........................................................................................29

       A.    Extent of Litigation ..........................................................................................30

       B.    The Risks of Litigation and the Need to Ensure the Availability of
             Competent Counsel in High-Risk Contingent Securities Cases .............................30

VIII.  COUNSEL FOR LEAD PLAINTIFFS' APPLICATION FOR
       REIMBURSEMENT OF EXPENSES ................................................................32

IX.    CONCLUSION.........................................................................................................32

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES - C-02-2270-JW(PVT)

- ii -

1    I, JEFFREY W. LAWRENCE, declare as follows:

2    1.    I am an attorney duly licensed to practice before all of the courts in the State of

3    California. I am a partner with the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins

4    LLP ("Lerach Coughlin"), Lead Counsel for the Settlement Class in the above-entitled action. I

5    have personal knowledge of the matters stated herein and, if called upon, I could and would

6    competently testify thereto. I submit this declaration in support of Lead Plaintiffs' motion for final

7    approval of the settlement set forth in the Stipulation of Settlement and Release dated as of

8    December 12, 2006; approval of the plan of allocation of settlement proceeds; and award of

9    attorney's fees and expenses.

10   **I.    INTRODUCTION**

11   2.    This securities class action settled after almost five years of extensive investigation

12   and litigation. This declaration is intended to provide the Court with facts sufficient to determine

13   that the Class claims have been thoroughly explored and aggressively pursued and that the

14   settlement of the class action for $78 million in cash is in the best interest of the Class.

15   3.    The settlement was reached only after the following events gave Lead Plaintiffs and

16   Lead Counsel grounds to believe a $78 million cash settlement is in the best interest of the Class:

17   (a)    An extensive factual investigation was conducted prior to the filing of the

18   Consolidated Complaint and the Consolidated Amended Complaint. The investigation included,

19   among other things, (1) the review of thousands of pages of documents including press releases,

20   SEC reports, media, and analyst reports, (2) the interviews of over 100 witnesses, including former

21   employees of VeriSign ("VeriSign" or the "Company") and other third-parties, (3) an analysis of the

22   domain name and web-security industries, and (4) an analysis of VeriSign's stock price, the stock

23   price of its peer group and the general market;

24   (b)    Lead Plaintiffs filed a detailed Consolidated Amended Complaint ("CAC") on

25   November 8, 2002 for violations of §§10(b) and 20(a) of the Securities Act of 1934 ("Securities

26   Act") and Rule 10b-5 promulgated thereunder. The allegations set forth in the CAC were based on

27   Lead Counsel's investigation, including information provided by former VeriSign employees who

28   had firsthand knowledge of VeriSign's alleged accounting improprieties and defendants'

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES- **C-02-2270-JW(PVT)**        - 1 -

involvement in and knowledge of the overall scheme to defraud.  On April 15, 2003, after an extensive briefing on defendant's motion to dismiss, the Court issued an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "April 15, 2003 Order"), upholding the CAC in its entirety, but dismissing two of the individual defendants.  Upon Lead Plaintiffs' request for reconsideration, the Court reconsidered the dismissal of the two individual defendants and kept them in the case as "controlling persons" of VeriSign under §20 of the Securities Act.  Additionally, Lead Counsel added §§11 and 15 claims arising out of the Illuminet acquisition;

(c)     Lead Plaintiffs aggressively pursued discovery and obtained key evidence from defendants and over 80 third-parties.  Discovery in this case has been hard fought as the parties disagreed on the scope, timing, format, and method of discovery from the very outset.  In fact, nearly every attempt to obtain discovery was resisted.  In total, plaintiffs filed or responded to at least 14 discovery motions seeking guidance from the Court on various discovery issues.  After a series of contentious discovery motions, plaintiffs obtained 72.93 gigabytes of electronic information from defendants;

(d)     Lead Plaintiffs and Lead Counsel successfully obtained a favorable order certifying the class, after the parties engaged in a series of contentious exchanges, including several discovery motions on the adequacy, typicality and standing of Lead Plaintiffs, and the qualifications of Lead Counsel.

(e)     Lead Counsel evaluated the issues of loss causation, materiality and damages and retained expert consultants to evaluate damages.  After the Supreme Court's ruling in *In re Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*"), and in light of the Ninth Circuit's ruling in *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ("*Daou*"), Lead Plaintiffs further evaluated their loss causation theory of the case.  On August 3, 2005, defendants attempted to dismiss the case again by filing a Motion for Judgment on the Pleadings based on loss-causation grounds.  After extensive briefing on the motion and pursuant to the Court's order on the motion, Lead Plaintiffs and Lead Counsel filed the Third Amended Class Action Complaint ("TAC") on December 30, 2005;

1    (f)    After the filing of the TAC, defendants continued to challenge the sufficiency

2    of Lead Plaintiffs' loss causation theory and, again, moved to dismiss the case.  After extensive

3    briefing, the Court issued an order granting in part and denying in part defendants' motion to dismiss

4    the TAC on April 6, 2006, holding that Lead Plaintiffs had met the standards of *Daou* in pleading

5    loss causation as to the domain name part of the scheme as disclosed by the April 25, 2002

6    disclosure.  Subsequent to the Court's April 6, 2006 Order and Lead Counsel's successful request for

7    reconsideration of the April 6, 2006 Order, Lead Plaintiffs proceeded to file a Fourth Amended Class

8    Action Complaint ("4AC") on May 12, 2006, which was superseded by the Fifth Amended Class

9    Action Complaint ("5AC") on June 30, 2006 pursuant to the Court's order.  The parties had

10   completed briefing on defendants' motion to dismiss the 5AC, which was pending in front of this

11   Court, at the time settlement was reached;

12   (g)    Lead Plaintiffs and Lead Counsel thoroughly evaluated the current financial

13   condition of VeriSign and the individual defendants;

14   (h)    Lead Plaintiffs researched the law and evidence relating to Lead Plaintiffs'

15   claims and defendants' defenses;

16   (i)    Lead Counsel, as authorized by Lead Plaintiffs, participated in several

17   mediation sessions and eventually successfully negotiated a settlement that is favorable to the Class.

18   4.    Lead Counsel seek approval of the Plan of Allocation ("Plan"), which determines

19   how the settlement proceeds will be distributed to eligible Class Members.  As explained below,

20   under the facts and circumstances of this case, the Plan is the most equitable method of distributing

21   the available settlement proceeds and therefore should be approved by the Court.

22   5.    Lead Counsel also seek payment of attorneys' fees of 25% of the Settlement Fund

23   obtained for the benefit of the Class.  The percentage fee requested is the benchmark fee in this

24   Circuit and is fair to the Class in light of the settlement achieved and the extensive work of counsel

25   for Lead Plaintiffs.  In addition, counsel for Lead Plaintiffs have advanced $4,300,599.61 in

26   expenses in prosecuting the class action and seek reimbursement of costs of $4.2 million.

27

28

## II.     HISTORY OF THE ACTION

### A.     Summary of Lead Plaintiffs' Claims Alleged in the Consolidated Amended Complaint and Subsequent Complaints

6.      The gravamen of Lead Plaintiffs' case is that throughout the Class Period (January 25, 2001 to April 25, 2002), defendants employed an assortment of schemes to defraud and mislead investors about the amount and source of revenues earned by VeriSign.

7.      This case arises as a result of VeriSign's attempt to convince the market that its ill-timed $18 billion acquisition of Network Solutions, Inc. ("Network Solutions"), the leading company in domain registration, was successful.  By this acquisition, VeriSign hoped to become the Internet's first utility, offering "soup-to-nuts" solutions for businesses that wanted to establish a presence on the Web where they could market and sell their products to other businesses and consumers.  Shortly after the acquisition was completed however, the Internet bubble collapsed, sending many Internet start-ups into bankruptcy and reducing demand for the types of products and services VeriSign offered.  Predictably, VeriSign's businesses suffered dramatically.

8.      Nevertheless, beginning in January 2001, after watching its market capitalization decline by over 60% after the acquisition, VeriSign sought to convince the market that its business was growing across all product lines.  In reality, VeriSign's revenue was fueled almost entirely by the Network Solutions Web site registry business, because demand for its encryption products and services had slowed as the number of companies conducting business over the Internet diminished. ¶¶5, 40-41.[1]  In order to make it appear that VeriSign was succeeding, Lead Plaintiffs assert that defendants engaged in a broad scheme to mislead the market concerning VeriSign's revenues and income.  ¶6.

---

[1]      All paragraph references ("¶") are to Plaintiffs' Consolidated Amended Complaint ("CAC"). As referenced above, the CAC and the SAC were substantively and substantially the same, except the SAC added Lead Plaintiffs' claims and standing for asserting the Sections 11 and 15 claims under the Exchange Act based on the false statements made in the registration statement.  Lead Plaintiffs' TAC was challenged on loss-causation grounds, which followed by the 4AC and the 5AC after the parties engaged in several extensive rounds of motions to dismiss and motion for judgment on the pleadings.

9.      Contemporaneous accounts from nine former VeriSign employees and two former employees of companies with whom VeriSign did business (CW1-CW11), as well as the Company's own post-Class Period statements, reveal how VeriSign sought to mislead the market.   Lead Plaintiffs contend that revenues reported by field units were "revised upward" before being reported to the market and VeriSign also inflated reported revenues by engaging in "roundtrip" transactions, whereby it would provide substantial "investments" in its customers so that those customers had a source of cash to purchase products and services from VeriSign.   Similarly, Lead Plaintiffs allege that VeriSign engaged in improper "barter" transactions whereby it would exchange products with those of another company for the sole purpose of allowing both entities to record the exchange as revenue even though no cash had changed hands and neither company had any use for the other's products.

10.     Further, Lead Plaintiffs assert that VeriSign actively attempted to conceal its actions and significant influence over its investees by making sure that its investments did not reach a 20% stake in any of its customers because that would have triggered a presumption of VeriSign's "significant influence" prohibiting VeriSign from reporting sales to those investees as revenue. ¶¶6(b), 120, 143-148.  But, as the CAC shows, VeriSign exercised significant influence over its investees even without reaching 20% ownership.

11.     Finally, Lead Plaintiffs contend that to hide the decline in VeriSign's former core business, defendants improperly segmented the Company's reported revenues based on size of customer rather than type of product, and then encouraged its sales staff to meet their targets by taking or "scrubbing" sales made by one division in order to report them as sales made by another. ¶¶6(e), 53-56.  As a result, investors could not tell how much of the Company's reported revenues came from the Network Solutions side, and how much came from the VeriSign side.  ¶¶149-154.  By manipulating the manner in which its financial results were presented and communicated to the market, defendants obscured the source of the Company's past growth, misled investors regarding demand for VeriSign's products, and falsely reported both the source and amount of its reported revenues.  ¶¶149-156.

12.     On March 26, 2004, based on new evidence that plaintiffs gathered in discovery, plaintiffs filed a Motion for Leave to Amend the Complaint to Add Claims for Violations of §§11 and 15 of the Securities Act of 1933.  After full briefing and a hearing on the matter, the Court granted plaintiffs' request on May 4, 2004.  On May 5, 2004, plaintiffs' filed their SAC adding §§11 and 15 claims.

13.     On December 30, 2005, plaintiffs filed their TAC, after defendants' unsuccessful move to challenge the case on *Dura* grounds.  The TAC alleged that plaintiffs were misled by defendants' overall scheme to conceal and misrepresent VeriSign's true financial condition and prospects for continued success, and were damaged when VeriSign's stock price declined after the Company's true financial condition was revealed.  In addition to expanding their allegations set forth the loss-causation theory in complying with *Dura,* the TAC provided details concerning defendants' overall scheme to defraud in two primary components:  (1) VeriSign's use of undisclosed and improper end-of-quarter related party, roundtrip and barter transactions to fuel its reported growth, and (2) misrepresentations regarding earnings derived from purported sales of domain names, including a growing pipeline of deferred revenues.

14.     Subsequent to the filing of the TAC, plaintiffs amended the complaint twice to expand their loss causation theory pursuant to the Court's orders.

**B.     The Parties**

15.     The defendants are VeriSign, Stratton D. Sclavos ("Sclavos"), Chairman and Chief Executive Officer, Dana L. Evan ("Evan"), Chief Financial Officer, Quentin Gallivan ("Gallivan"), Executive Vice President of Worldwide Sales and Services, and Robert J. Korzeniewski ("Korzeniewski"), Executive Vice President of Business Development.

**C.     The Commencement of the Action; Consolidation and the Appointment of Lead Plaintiffs**

16.     The initial complaint against VeriSign and the defendants was filed on May 9, 2002. Twelve complaints were filed between May 9, 2002 and July 2, 2002.  On July 26, 2002, the Court appointed Sheet Metal Workers' Local Union No. 19 Pension Fund ("SMW"), StoneRidge Investment Partners, LLC, Wilson Telephone Company, Inc., ("WTC"), Oregon Telephone

Company ("OTC"), Ralph Michael ("Michael") and Raymond E. Donnelly ("Donnelly") as Lead Plaintiffs.  Lead Plaintiffs filed the consolidated amended class action complaint on November 8, 2002.

**D.     Lead Plaintiffs' Consolidated Complaint and Defendants' Motion to Dismiss**

17.     Prior to and after the Court appointed Lead Plaintiffs, Lead Plaintiffs and Lead Counsel conducted an extensive investigation including:

- Researching the business of VeriSign, its competition, and factors impacting its operations;

- Researching public statements about VeriSign, including statements made in conference calls, documents filed with the SEC, press releases and analyst reports;

- Interviewing over 100 individuals, including numerous former employees of VeriSign, and employers of third-parties that entered into roundtrip, barter, or related-party transactions with VeriSign;

- Analyzing how the Company's reported financial results violated Generally Accepted Accounting Principles ("GAAP"), SEC rules and VeriSign's publicly reported accounting policies;

- Researching the compensation of the individual defendants and their job responsibilities prior to, during and after the Class Period;

- Researching the insider trading of the individual defendants, including a study on the timing, frequency, magnitude, and patterns of their trading activities;

- Reviewing analyst reports concerning VeriSign and the domain name and internet security industries in general; and

- Analyzing the price of the Company's stock before, during and after the Class Period, and how the price of the Company's stock performed relative to its peer group and general market.

18.     Lead Counsel utilized its in-house investigators and retained outside investigators to contact and interview numerous former employees of VeriSign.  The information provided by the various witnesses was critical to preparing a complaint that provided the particularity required by the heightened pleading standards under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as the Court noted in its April 15 Order, "Plaintiffs have provided many specific examples, through several confidential witnesses, of alleged fraudulent practices committed by Defendants." April 15, 2003 Order at 6.

19.    On November 8, 2002, Lead Plaintiffs filed their CAC.  Lead Plaintiffs alleged the defendants violated §§10(b) and 20(a) of the Exchange Act, primarily by causing the Company to report materially false and misleading financial results.  On January 10, 2003, defendants moved to dismiss the CAC, which plaintiffs opposed on February 26, 2003.  Defendants filed their reply on March 26, 2003.  On April 15, 2003, the Court issued an Order upholding the entirety of the CAC, but dismissed defendants Gallivan and Korzeniewski because they were not alleged to have made any false statements.  Moreover, based on its review of the CAC, the Court concluded that plaintiffs had adequately pled scienter with respect to all of the individual defendants regarding the claim for insider trading, and that plaintiffs had adequately pled fraud with particularity of alleged fraudulent practices committed by Defendants.  Subsequently, the Court brought defendants Gallivan and Korzeniewski back into the case after Lead Plaintiffs requested the Court to reconsider them for §20(a) liability.

E.    **Lead Plaintiffs' Second Amended Complaint and Defendants' Motion to Dismiss**

20.    On May 5, 2004, after the Court granted Lead Plaintiffs' motion for leave to amend the complaint to add claims for violations of §§11 and 15, plaintiffs field Consolidated Second Amended Class Action Complaint ("SAC").  The SAC is substantively the same as the CAC, but added Lead Plaintiffs' claims and standing for asserting the §§11 and 15 claims based on the false statements made in the registration statement.  No motion to dismiss briefing followed the filing of the SAC, as Lead Plaintiffs' 1933 Act claims arise from the same false financial statements in VeriSign's quarterly and annual SEC filings prior to the Illuminet acquisition that were previously alleged in the CAC.  In fact, the SAC's allegations concerning those false statements are ***identical in every respect*** to the allegations contained in the original complaint – the paragraph numbers are the same.

F.    **Lead Plaintiffs' Third Amended Complaint and Defendants' Motion to Dismiss**

21.    On August 3, 2005, based on the Supreme Court decision in *Dura*, defendants filed a Motion for Judgment on the Pleadings, Motion to Strike and Motion to Shorten the Class Period.  Defendants argued, in essence, that plaintiffs' SAC did not sufficiently plead loss causation

consistent with *Dura*.   Specifically, defendants argued that Lead Plaintiffs failed to adequately allege a causal connection between the corrective disclosures on February 6, 2002, March 19, 2002 and April 25, 2002 and VeriSign's share price decline in response to these disclosures.   Accordingly, defendants asked the Court to strike the allegations concerning these three disclosures, dismiss the claims based on these allegations, and shorten the class period to end on March 19, 2002.

22.   On September 1, 2005, Lead Plaintiffs opposed defendants' Motion for Judgment on the Pleadings.   Lead Plaintiffs contended that not only did the SAC comply with then-settled Ninth Circuit law regarding the pleading of loss causation at the time it was filed, it also complied with *Dura* requirements, as the SAC alleged that VeriSign's "true financial condition" was not revealed until April 25, 2002 when VeriSign reported a combination of disappointing quarterly earnings and dramatically lowered expectations for the rest of the fiscal year and announced a major restructuring of its operations.   Lead Plaintiffs also proffered that the sharp decline in the price of VeriSign stock following the April 25, 2002 revelations of deteriorating business conditions – including declining domain name registrations, rising accounts receivable balances, and a reduced revenue pipeline – was causally connected to defendants' misrepresentations about the amount and source of the Company's revenue and the demand for its products during the Class Period.

23.   On September 12, 2005, defendants filed their reply in further support of their motion.   On October 31, 2005, the Court issued an order granting in part and denying in part defendants' Motion for Judgment on the Pleadings ("October 31, 2005 Order").   In applying *Dura* and the Ninth Circuit decision, *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005), following *Dura*, the Court held that of the five categories of misstatements and omissions alleged in the SAC, Lead Plaintiffs only adequately pled loss causation as to the allegations regarding improper revenue recognition of reciprocal and related-party transactions.   The Court ruled, that the February 6, 2002, March 19, 2002, and April 25, 2002 disclosures cited by Lead Plaintiffs did not satisfy the causal link requirements as to the other four categories of fraud alleged by Lead Plaintiffs. Moreover, the Court held that the April 25, 2002 disclosure was "not linked to any misstatements alleged in the complaint" and that Lead Plaintiffs did not "plead any specific disclosure made by VeriSign on April 25, 2002, as being the substantial cause for the decline in stock price."   October

1   31, 2005 Order at 10.  The Court, however, granted Lead Plaintiffs' request for leave to amend the

2   complaint.

3          24.     On December 30, 2005, plaintiffs filed the Third Amended Class Action Complaint

4   ("TAC").  Consistent with *Dura*, the TAC added allegations to provide defendants with notice of

5   plaintiffs' theory of how the scheme caused their losses.  Furthermore, the TAC identified the

6   principal price declines on which Class losses are premised and described with specificity the causal

7   connection that Lead Plaintiffs have in mind between each of those declines and all or part of the

8   scheme to defraud alleged in the TAC.  Additionally, the TAC provided details of the fraudulent

9   scheme and defendants' participation in the scheme, quoting extensively from internal e-mails and

10  other evidence obtained in discovery, demonstrating that each of the individual defendants had direct

11  and personal knowledge of the undisclosed problems in the domain name business, the extensive

12  reliance on improper transactions to boost revenues and the various accounting improprieties

13  employed by VeriSign in its effort to conceal the true condition of the Company.[2]

14         25.     On January 30, 2006, defendants moved to dismiss the TAC, arguing that Lead

15  Plaintiffs again failed to plead loss causation.  On February 27, 2006, Lead Plaintiffs opposed the

16  motion to dismiss.  On March 13, 2006, defendants filed their reply in further support of the motion

17  to dismiss.

18         26.     On April 6, 2006, the Court issued an order granting in part and denying in part

19  defendants' motion to dismiss the TAC ("April 6, 2006 Order").  Specifically, the Court examined

20  the disclosures on March 19, 2002 and April 25, 2002.  The Court held that, based on plain reading

21  of ¶397 of the TAC, the allegation that "the true financial condition of the Company continued to be

22  concealed from investors" is a clear statement and that, as of March 20, 2002, the market did not

23  know the Company's true financial condition, and thus the losses prior to March 20, 2002 could not

24  ───────────────────────

25  [2]       Because of the governing protective order in this case and that defendants have designated
    most of their deposition testimonies and documents produced during the course of discovery as
26  confidential pursuant to the protective order, a substantial portion of plaintiffs' TAC, 4AC and 5AC
    has been filed under seal.  Consistent with the protective order, this declaration will only make
27  general references to the various categories of the overall scheme as discussed in the Court's orders.

28

have been based on the market's awareness of VeriSign's true financial condition.  Additionally, the Court held that with respect to all five categories of fraud alleged in the TAC, Lead Plaintiffs had met the standards of *Daou* in pleading loss causation as to the domain name part of the scheme by the April 25, 2002 disclosure.  The Court, therefore, dismissed the rest of the allegations set forth in the TAC.

27.    On April 20, 2006, Lead Plaintiffs timely filed for reconsideration of the Court's April 6, 2006 Order on the grounds that the Court manifestly erred in (1) determining Lead Plaintiffs' loss causation theory by focusing on only one paragraph of the TAC when Lead Plaintiffs' theory was laid out throughout the TAC; (2) refusing an amendment and dismissing with prejudice when the Court mistakenly concluded that Lead Plaintiffs had "simply removed" language in the prior Complaint after the Court's prior order.  Defendants opposed Lead Plaintiffs' motion for reconsideration on April 25, 2006.

### G.    Lead Plaintiffs' Fourth Amended Complaint and Defendants' Motion to Dismiss

28.    On May 12, 2006, pursuant to the Court's April 6, 2006 Order and while Lead Plaintiffs' April 26, 2006 motion for reconsideration was pending, plaintiffs filed the 4AC.

29.    On June 5, 2006, the Court issued an Order Granting Leave to Amend; Denying Motion for Leave to File Motion for Reconsideration as Moot; Denying Miscellaneous Administrative Request as Moot ("June 5, 2006 Order").  Specifically, while the Court did not find that its dismissal of certain allegations in the TAC were in error, the Court recognized that it was perhaps unduly severe in striking the bulk of plaintiffs' allegations with prejudice.  Thus, the Court reconsidered its April 6, 2006 Order and granted Lead Plaintiffs leave to amend to file a fifth amended complaint.

### H.    Lead Plaintiffs' Fifth Amended Complaint and Defendants' Motion to Dismiss

30.    On June 30, 2006, Lead Plaintiffs filed the 5AC.  Defendants moved to dismiss the 5AC on August 16, 2006, again contending that the 5AC failed to sufficiently pled loss causation with respect to VeriSign's use of roundtrip, barter and related-party transactions to further defendants' overall scheme to defraud.  Lead Plaintiffs filed their opposition on October 2, 2006,

1   contending that the 5AC sufficiently alleges loss causation as to the roundtrip, barter and related-

2   party transactions, and that the disclosure that VeriSign had booked a significant amount of revenue

3   from these transactions partially revealed the Company's true condition and caused the February and

4   March stock drops.  Defendants' filed their reply in further support of the motion to dismiss on

5   October 16, 2006.  The parties subsequently agreed to continue the hearing on the motion to dismiss,

6   pending the parties' settlement efforts.

7   **I.      Lead Plaintiffs' Experts, Consultants, and Investigators**

8        31.     In addition, throughout the litigation, counsel conferred with a number of experts and

9   consultants with expertise in evaluating materiality, loss causation, damages and accounting issues.

10              (a)     Lead Counsel retained D. Paul Regan, President and Chairman of Hemming

11  Morse, Inc. and a Director in the Litigation Services Group, as an expert to analyze various

12  accounting and financial reporting issues.  Mr. Regan has more than 30 years of experience in

13  forensic accounting.  Mr. Regan's experience in litigation consulting covers a broad range of case

14  issues, including construction accounting, construction claims, product liability, antitrust, fraud,

15  intellectual property, securities and contract questions, embezzlement and professional liability.  Mr.

16  Regan has testified as an expert witness for small entities as well as for large publicly held

17  companies, and has appeared before various state courts, federal courts, the California Public

18  Utilities Commission, the American Arbitration Association, and The World Court.  Mr. Regan is a

19  member of numerous professional organizations and is the current Chair of the California Society of

20  CPAs.

21              (b)     Lead Counsel retained Blaine Nye and Beth Charlesworth from Stanford

22  Consulting Group, Inc. to analyze damages and loss-causation issues.   Mr. Nye and Ms.

23  Charlesworth have extensive consulting experience emphasizing finance and marketing, including

24  providing study of stock price fluctuations for securities litigation, and analyzing separated effects of

25  general economic and industry events from effects of company-specific events on the stock price.

26       32.     Lead Counsel also utilized Lerach Coughlin's forensic accountants regarding the

27  alleged accounting improprieties.  Specifically, the in-house forensic accountants' assistance to Lead

28  Counsel included the following:

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES- **C-02-2270-JW(PVT)**          - 12 -

- •     Discovery of the Domain Name Fraud, as summarized in §III below;

- •     Assisting Lead Counsel on issues relating to GAAP and SEC rules including revenue recognition, related-party and barter transactions, investment accounting, and reserving for receivables where collection was not probable, as well as other applicable GAAP and Generally Accepted Auditing Standards related to the various alleged accounting improprieties;

- •     Providing significant assistance to Lead Counsel in analyzing and responding to defendants' motions to dismiss;

- •     Identifying, analyzing and categorizing evidence of improper transactions, drawn from thousands of fragmented financial documents, customer records, accountants' workpapers and other documents produced in the case; and

- •     Assisting Lead Counsel in the preparation of document requests and subpoenas to the Company, the Company's auditors, and various other third-parties.

33.     Lead Counsel retained outside forensic investigators for help identifying, locating and contacting percipient witnesses who may have knowledge of the scheme alleged in the Complaint. This was crucial since the PSLRA requires plaintiffs' Complaint to be pled with specificity and particularity.

**J.     Lead Plaintiffs' Formal Discovery**

     **1.     Initial Disclosures**

34.     The parties held their Fed. R. Civ. P. 26(f) conference following the Court's April 15, 2003 Order. Following the parties' exchange of their Initial Disclosures on July 30, 2003, the parties met and conferred regarding the scope of the disclosures. Even though the Federal Rules of Civil Procedure dictate what should be disclosed, the parties disagreed, from the outset, on the disclosures required.

35.     Defendants' Initial Disclosures identified (1) 13 witnesses without the address and contact information for all witnesses, and (2) 10 categories of documents without identifying the type and location. After the parties meet and confer came to an impasse, Lead Plaintiffs proceeded to file a motion to compel defendants to supplement their Rule 26(a)(1) disclosures. *See* §L discovery motion below.

36.     Lead Plaintiffs' Initial Disclosures identified over 150 witnesses whom Lead Plaintiffs believed were likely to have discoverable information that Lead Plaintiffs might use to support their claims. As previously noted, in the course of the investigation prior to filing the CAC,

1  Lead Counsel had interviewed over 100 former VeriSign employees and other third-parties.  During

2  the meet and confer process, defendants contended that Lead Plaintiffs should pare down the list of

3  individuals who purported to have relevant information.  Lead Plaintiffs believed that defendants'

4  request to "pare down" the individuals identified in Lead Plaintiffs' disclosures was a mere attempt

5  to seek the identity of Lead Plaintiffs' confidential witnesses – information Lead Plaintiffs believe is

6  protected work product and not required to be disclosed under Rule 26.  After the parties failed to

7  reach an agreement on whether the identity of the confidential witnesses would be protected work

8  product, defendants filed a motion to compel the identity of the confidential witnesses.  *See* §L

9  discovery motion below.

10              **2.       Document Requests Propounded by Lead Plaintiffs**

11             37.     At the outset of discovery, Lead Plaintiffs served a set of 43 document requests.  Lead

12  Plaintiffs' requests included all documents concerning the following: (1) defendants' 26 disclosures;

13  (2) VeriSign's accounting policies and procedures, for revenue recognition and financial disclosure,

14  (3) any independent audit or review of VeriSign's financial statements or any disagreement with

15  VeriSign's independent auditors; (4) VeriSign's business plans, operational plans, investment

16  strategy, sales and marketing plans, business development plans, customer engagement plans, or

17  other strategic plans; (5) all market analyses or similar documents analyzing or describing customer

18  demand for VeriSign's products or services; (6) any gap analysis performed for VeriSign; (7) emails

19  and other communications concerning VeriSign's revenues, deferred revenues, accounts receivable,

20  forecasts, performance, investment activities, acquisitions, related-party transactions, affiliates,

21  investees, technology partners, monetary or non-monetary exchanges, business plans, or financial

22  reporting; (8) VeriSign's insider trading policies; (9) actual, projected or deferred revenues of

23  VeriSign or any of its divisions; (10) all delinquency reports, accounts receivable reports, accounts

24  receivable aging reports; (11) any collection efforts with respect to VeriSign's affiliates, technology

25  partners, investees, or related parties; (12) any monetary or non-monetary reciprocal transactions that

26  VeriSign engaged in; (13) investments by VeriSign in entities which purchased or otherwise

27  obtained products or services from VeriSign; (14) the amount of revenues forecast or recognized

28  from customers or entities in which VeriSign invested; (15) all communications between VeriSign

and its shareholders, including all prospectuses, annual reports, and documents prepared, distributed at or used in connection with the Company's annual shareholder meeting; and (16) all drafts of press releases issued by VeriSign.

38.     In response, VeriSign served objections to Lead Plaintiffs' request for documents, without indicating whether, when, or what it would produce. Lead Plaintiffs immediately requested a meet and confer which began a long meet and confer effort with VeriSign to obtain a full production of documents.

39.     The parties also negotiated the production of documents electronically preserved. After refusing to produce any electronic documents in native format, Lead Plaintiffs moved to compel production. The vast majority of defendants' documents, including all of VeriSign's electronic documents, was made available to Lead Plaintiffs only after extensive briefing and agreement in connection with the motions to compel. On April 7, 2004, Lead Plaintiffs conducted a 30(b)(6) deposition of VeriSign and learned that electronic documents were not preserved until September 2002 – four months after this case was filed. Further, the deposition also revealed that defendants have failed to search relevant back-up files and the files of key percipient witnesses.

40.     In total, in response to Lead Plaintiffs' discovery requests and various favorable discovery orders obtained by the Lead Plaintiffs, defendants produced approximately 72.93 gigabytes of information.

### 3.     Depositions Taken by Lead Plaintiffs

41.     In the course of litigation, Lead Plaintiffs served several deposition notices for key percipient witnesses who had first-hand knowledge of the allegations of fraud. The noticed deponents included former VeriSign employees and KPMG auditors. Additionally, Lead Plaintiffs took a 30(b) deposition of the Company concerning its electronic data preservation, maintenance and production. Plaintiffs also took a 30(b)(6) deposition of the Company's auditors, KPMG, regarding the key accounting issues being litigated. In total, 22 depositions were taken, including a handful of high-level executives from VeriSign's business and corporate departments who had first-hand knowledge of the various schemes alleged. Because of the parties' settlement effort, the parties

1   agreed not to proceed with additional depositions in an effort to facilitate and focus on the settlement

2   discussions.

3   **4.      Third-Party Discovery Taken by Lead Plaintiffs**

4   42.      In addition to discovery directed to the defendants and VeriSign, Lead Plaintiffs

5   pursued discovery from over eighty third-parties.  VeriSign's auditors KPMG LLP alone produced

6   more than 40 boxes of hand-copy documents and 121 CDs and disks of workpapers in response to

7   Lead Plaintiffs' requests.   These third-parties produced tens of thousands of documents, which

8   provided additional documentary support for Lead Plaintiffs' allegations.  These third parties were

9   categorized into the following groups:

10   (a)      Third-party vendors.  Lead Counsel separately met and conferred to negotiate

11   with each of the third-parties to obtain contemporaneous documents reflecting the circumstances

12   surrounding the roundtrip, barter or related-party transactions at issue.  This group of third-parties

13   that produced documents to Lead Plaintiffs included Air2Web; Quova; eOne, Phoenix Technologies;

14   eSign; Roving; IBM; Nominum; Yodlee; Kontiki; Infospace; 724 Solutions; Affinity Internet;

15   Citysearch.com; Keynote; Critical Path; Authentium; ActivCard; Aceva; Lightbridge; Identix; Pitney

16   Bowes; Bizrate.com; Homestead.com; Qualys; DNS; Qualys Amex; Worldpay; Ztango; Cybercash

17   Inc.; USA.net; Go2; netForensics; Juniper Networks; Access 360; netForensics; Slam Dunk

18   Networks; Worldpay; AOL; Go2; Neoteris; CPA2BIZ; Netnumbers; Clear Commerce; Wand and

19   Yellowpages.com.  Additionally, Lead Counsel was persistent in pursuing documents from other

20   third-parties who refused to comply with the subpoenas through their continuing meet and confer

21   efforts including seeking judicial guidance when necessary.

22   (b)      Research analysts.  Lead Counsel pursued evidence from these analysts

23   concerning the timing, materiality, and accuracy of the disclosures that VeriSign made to the

24   investment community.  This group included Credit Suisse First Boston; Morgan Stanley; Prudential

25   Financials/Wachovia Securities; Merrill Lynch; SG Cowen; UBS Warburg; Wachovia, Spear, Leeds

26   and Kellog; Segal Advisors, Inc. and Legg Mason.

27   (c)      Industry analysts, consultants, and advisers.  This group of third-parties

28   included SnapNames, Bain and Co. ("Bain"), Bessemer Venture Partners ("Bessemer"), General

1    Atlantic Partners and PriceWaterhouseCoopers LLP ("PwC"). Lead Counsel propounded discovery

2    from SnapNames because SnapNames published the State of Domain Name ("STOD") reports

3    which many of the analyst covering VeriSign used in generating their analysis on VeriSign's domain

4    name business. Additionally, evidence gathered by plaintiffs also revealed the multiple business

5    relationships between VeriSign and SnapNames. Lead Counsel sought discovery from Bain and

6    PwC because they provided consulting services to VeriSign concerning the domain name business.

7    Finally, Lead Counsel also sought documents from Bessemer relating to entities that Bessemer co-

8    invested in with VeriSign, since Bessemer's managing partner David Cowan, also served on the

9    board of VeriSign during the relevant time period.

10                    (d)        Auditors. Lead Counsel aggressively sought evidence from KPMG,

11    VeriSign's auditors throughout the Class Period. The KPMG documents were pivotal to Lead

12    Plaintiffs' discovery of the domain name fraud, as the information concerning how VeriSign was

13    calculating its revenue and deferred revenue from domain name registries was documented in the

14    KPMG workpapers. These documents uncovered VeriSign's improper accounting for domain name

15    sales and false and misleading reporting of domain name sales. Additionally, the KPMG documents

16    provided corroborating evidence concerning the improper revenue recognition on roundtrip barter

17    and related-party transactions.

18         43.    By early March 2005, Lead Plaintiffs had reviewed the bulk of the documents

19    produced in the litigation, and had negotiated and briefed numerous discovery issues.

20         44.    The documents produced provide strong evidentiary support of Lead Plaintiffs'

21    claims that defendants made false and misleading statements and omissions to the public in violation

22    of federal securities laws and engaged in accounting improprieties. During formal discovery, Lead

23    Plaintiffs also continued to pursue informal discovery of third-parties by way of interviewing former

24    employees of VeriSign and VeriSign's customers, and obtaining their help in interpreting documents

25    obtained in discovery. *See* Summary of Evidence, at §III, *infra*.

26         **K.    Defendants' Formal Discovery**

27         45.    Lead Plaintiffs and Lead Counsel responded to discovery propounded by defendant

28    VeriSign. On November 26, 2003, defendant VeriSign propounded a set of document requests and a

set of interrogatories to each of the Lead Plaintiffs who petitioned to be class representatives. The 56 document requests propounded by VeriSign sought information concerning the Lead Plaintiffs' standings, adequacy and typicality to serve as class representatives, as well as the evidence that Lead Plaintiffs and Lead Counsel considered, consulted, relied upon, read, reviewed or analyzed in connection with the preparation of the complaints filed in this case. The 24 interrogatories propounded by defendant VeriSign sought information relevant to each Lead Plaintiff's stock purchases, including non-VeriSign securities, trading philosophies and strategies, as well as the identity of each confidential witness that Lead Plaintiffs referenced in the Consolidated Amended Complaint.

46.     In preparing the responses and objections to defendant VeriSign's discovery requests, Lead Counsel spent hours consulting with each of the Lead Plaintiffs and their respective brokerage firms. Lead Counsel also met and conferred with defense counsel regarding the scope and propriety of the propounded discovery. Lead Plaintiffs responded to these discovery requests on December 6, 2006, followed by document production. Following the parties' good faith efforts to resolve the discovery disputes, Lead Plaintiffs supplemented their Fed. R. Civ. P. 26 Initial Disclosures, produced the Lead Plaintiffs' trading records and documents concerning VeriSign, and supplemented some of their interrogatory responses. The parties, however, did not agree on several issues — issues that Lead Plaintiffs believed were irrelevant to class certification or the merits of the case, or matters that were highly intrusive to Lead Counsel's work product. The parties sought judicial intervention on those issues.

## L.     Discovery Motions

47.     As stated above, discovery commenced in this action immediately following the Court's April 15, 2003 Order and had been hard fought to say the least. From the beginning the parties disagreed on what needed to be produced, when it needed to be produced and in what format. The discovery motions filed by the parties are as follows:

(a)     On October 8, 2003, after the parties failed to reach an agreement on the tiers of confidential designations needed for confidential information that VeriSign anticipated to produce, both parties submitted their version of the protective order the Court's consideration. After

1   a full briefing on the matter, the Court approved defendants' version of the protective order, which

2   essentially permitted two-tiers of confidential designations consistent with the model protective

3   order for the Northern District of California.

4          (b)     On December 23, 2003, after the parties failed to reach an agreement on

5   several discovery issues, Lead Plaintiffs filed *three* motions to compel against defendants: (1)

6   motion to compel defendants to timely produce responsive documents and supplement responses to

7   Lead Plaintiffs' first set of interrogatories; (2) motion to compel defendants to supplement Rule

8   26(a)(1) disclosures and produce all documents required to be identified therein; and (3) motion to

9   compel defendants to produce all electronic evidence in electronic form.  After full briefing and a

10   hearing on these discovery motions, Magistrate Judge Patricia Trumbull issued three favorable

11   discovery orders on February 6, 2004, granting all three discovery motions.

12          (c)     On February 3, 2004, after the parties failed to resolve their differences in the

13   meet and confer process, defendants filed a motion to compel further responses (1) the identity of

14   Lead Plaintiffs' confidential witnesses, and (2) Lead Plaintiffs' trading records for all securities.  In

15   response, Lead Plaintiffs filed an opposition to defendants' motion to compel and a request for a

16   protective order, with supporting declaration from each of the Lead Plaintiffs detailing the reasons

17   for seeking the protective order.  After full briefing and a hearing on these discovery issues,

18   Magistrate Trumbull issued an Order on March 19, 2004, granting in part defendants' motion to

19   compel.  In response to the March 19, 2004 Order, Lead Plaintiffs supplemented their discovery

20   responses and produced additional documents in complying with the order.

21          (d)     On February 23, 2004, in response to Magistrate's February 6, 2004 orders,

22   defendant filed two motions: (1) Motion for Clarification and Motion for Leave to File Motion for

23   Reconsideration of Orders Re. Electronic Discovery and Supplemental Responses to Plaintiffs' First

24   Set of Interrogatories; and (2) objections to the orders regarding the same.  On March 1, 2004, Lead

25   Plaintiffs responded to defendants' motion for clarification and objections, with a supporting expert

26   declaration on electronic discovery.  On March 4, 2004, Magistrate Trumbull denied defendants'

27   motion for reconsideration.  On March 10, 2004, this Court rejected the objections filed by

28   defendants.

1     (e)     On April 2, 2004, in response to Magistrate Trumbull's March 19, 2004 Order

2   compelling trading records of non-VeriSign securities, Lead Plaintiff StoneRidge filed objections to

3   the order on the basis that since StoneRidge is in the investment business, requiring it to produce all

4   non-VeriSign securities would essentially be requiring StoneRidge to produce all of its business

5   records.  Defendants responded to the objections on April 7, 2004.

6     (f)     Additionally, on April 13, 2004, StoneRidge also filed a request to stay from

7   the Court's March 19, 2004 Order, which defendants opposed on the same day, asking the Court to

8   sanction StoneRidge for non-compliance with the Court's discovery order.  On April 16, 2004, after

9   an expedited hearing request and briefing schedule, the Court issued an order overruling

10  StoneRidge's objections to the Magistrate's Order.  On April 19, 2004, StoneRidge filed a notice of

11  withdrawal from the case as Lead Plaintiff.  On April 27, 2004, defendants withdrew their motion for

12  sanctions against StoneRidge.

13    (g)     On April 19, 2004, Lead Plaintiff Donnelly filed a motion to quash document

14  subpoenas issued to Donnelly's three brokers seeking all documents concerning trades by Donnelly

15  in his individual capacity, rather than the trades by Donnelly, as the Trustee of the Donnelly Living

16  Trust.  After an expedited briefing on this issue, the parties reached a resolution informally.  On

17  April 29, 2004, Lead Plaintiff Donnelly withdrew the motion to quash.

18    (h)     On May 18, 2004, after several months of meet and confer on privilege issues,

19  Lead Plaintiffs filed a motion to compel production of documents designated as privileged, after

20  learning that defendants essentially did not do any document-by-document review before blanketly

21  asserting privilege over tens of thousands of documents.  Defendants opposed the motion on May 26,

22  2004.  On May 27, 2004, without waiting for Lead Plaintiffs to file a reply to the motion to compel

23  and without oral argument, Magistrate Trumbull issued an order clarifying the Court's previous

24  order on the privilege issue, specifically noting that the Court's prior order "expressly mandated that

25  only privileged documents could be withheld, and that if there was insufficient time to determine

26  whether documents were privileged, they would be produced, and the entire production would be

27  deemed 'Confidential – Attorneys' Eyes Only' until defendant could identify which documents were

28  privileged and were to be deleted from the electronic files by plaintiffs."   The Court ordered

1    defendants to re-do the entire production of electronic files by June 2, 2004.  The Court further

2    ordered that defendants may only withhold documents for which an attorney has made a good faith

3    determination that the document is privileged, work product, or non-responsive.  Additionally, the

4    Court warned that failure to comply with the order will result in the sanction of a complete waiver.

5              (i)     On June 11, 2004, defendants objected to the Court's May 27, 2004 Order.

6    On the same day, Lead Plaintiffs filed a motion for order directing the complete waiver of privilege

7    for defendants' failure to comply with the Court's May 27, 2004 Order, after learning that

8    defendants' June 2, 2004 re-production had several major problems.  Specifically, the June 2, 2004

9    electronic productions were produced in separate electronic files without any source information or

10   information concerning how they were kept in the ordinary course of business.  Moreover, the re-

11   production did not have the metadata associated with the electronic files, thus, making it impossible

12   for plaintiffs to review non-integrated, out of context electronic data in several forms.  On June 11,

13   2004, defendants opposed plaintiffs' motion for order directing the complete waiver of privilege.  On

14   July 8, 2004, plaintiffs filed their reply motion.  On July 16, 2004, Magistrate Trumbull issued an

15   order denying plaintiffs' request, giving defendants another opportunity to cure their privilege log

16   deficiencies.

17             (j)     On June 17, 2004, defendants filed a motion for (1) extension of time to serve

18   privilege log and (2) a procedure to delete inadvertently produced privilege e-mail from Lead

19   Plaintiffs' copies of defendants' electronic documents.  The Court granted the request for extension,

20   and set a briefing schedule for the second motion.  On June 23, 2006, Lead Plaintiffs opposed

21   defendants' proposal to establish a procedure to delete inadvertently privileged e-mail from Lead

22   Plaintiffs' copies of defendants' production.  On July 8, 2004, after an extensive meet and confer, the

23   parties submitted a joint brief regarding the procedure to be used to delete inadvertently produced

24   privileged documents.  On July 16, 2004, Magistrate Trumbull issued an order setting forth the

25   procedure for deleting privileged documents from electronic data.

26             (k)     On July 28, 2004, in connection with class certification discovery, defendants

27   filed a motion to compel further deposition of Lead Plaintiff Ralph Michael after Lead Plaintiffs

28   refused to make him available for a third day of deposition.  After the parties' request for expedited

1    briefing was granted, Lead Plaintiffs opposed the motion on August 6, 2004, and defendants filed

2    their reply on the same day.  On August 10, 2004, the Court issued an order granting defendants'

3    motion.

4           **M.**      **Class Certification and Related Motion**

5          48.     Lead Plaintiffs filed a motion for class certification on April 21, 2004, asking the

6    Court to appoint Raymond E. Donnelly, Ralph Michael, OTC, SMW, StoneRidge and WTC as the

7    class representatives and certify the action as a class action.  On July 2, 2004, after taking more than

8    six months of class certification related discovery, defendants opposed the class certification motion.

9          49.     In connection with defendants' opposition to plaintiffs' motion for class certification,

10   defendants filed a Motion for Partial Summary Judgment, or In the Alternative, Summary

11   Adjudication ("Partial Summary Judgment") on July 19, 2004.  Defendants contended that since it

12   would have been impossible for the Lead Plaintiffs to rely on any misstatements after their last

13   purchases, and that the last purchase by any of the Lead Plaintiffs and proposed class representative

14   was December 31, 2001, that the Class Period should be shortened to the last day of any Lead

15   Plaintiffs and proposed class representatives' last purchase.  Additionally, defendants challenged

16   Lead Plaintiff SMW's standing, contending that since SMW had delegated the investment decision

17   to its fund managers, that it did not make any investment decision to acquire VeriSign securities and

18   thus was not a "purchaser" of VeriSign securities.

19         50.     Lead Plaintiffs opposed the Partial Summary Judgment on August 2, 2004, citing to

20   the controlling law in the Ninth Circuit that holds that a class representative who suffered injury

21   from a common course of culpable conduct by the defendants has standing to represent all others

22   similarly situated.  Additionally, Lead Plaintiffs proffered that SMW closely monitored SMW's

23   investment by establishing its investment strategies and portfolio and investment managers' specific

24   guidelines to follow and implement.  Thus, SMW is a "purchaser" of the VeriSign securities.  On

25   August 6, 2004, Lead Plaintiffs filed their reply in further support of their motion for class

26   certification

27         51.     On January 13, 2005, the Court issued an Order Granting Class Certification and a

28   second Order Denying Defendants' Motion for Summary Judgment.  The Court essentially rejected

1    defendants' challenges as to the standing,  adequacy and typicality of the remaining class

2    representatives and appointed SMW, WTC, OTC, and Donnelly as class representatives.

3    Additionally, the Court appointed Lerach Coughlin as sole Lead Counsel for plaintiffs, noting that

4    "[Lerach Coughlin] has done the most amount of work in this case."  January 13, 2005 Order at 16.

5    **III.    SUMMARY OF EVIDENCE OBTAINED IN DISCOVERY**

6         52.    Discovery – both formal and informal – was extensive in this case.  By the time the

7    parties reached the settlement, Lead Plaintiffs understood the strengths and weaknesses of the class

8    claims.

9         53.    Lead Plaintiffs and Lead Counsel believe the evidence received and reviewed

10   confirms the allegations that defendants violated the securities laws by knowingly or recklessly

11   causing VeriSign to report fraudulent financial results and by making other materially false and

12   misleading statements.

13        54.    Lead Plaintiffs contend that Defendants' fraud cut across virtually all lines of

14   VeriSign's business and, as the discovery to date has shown, was essentially defendants' attempt to

15   meet Wall Street's expectations on a quarterly and yearly basis.  The scheme was carried out in the

16   following general ways:

17        (1) **Domain Name Fraud.** VeriSign manipulated the revenue from its newly acquired

18   Network Solutions subsidiary through a number of different accounting improprieties, including

19   improperly inflating receivables, revenue and deferred revenue from domain name renewals by

20   arbitrarily concluding that customers would automatically renew their domain name contracts for 2

21   years.  In addition, VeriSign masked the decline in new domain name registrations by giving away

22   thousands of names for free in bulk sales and then inflated revenues, deferred revenues and

23   receivables by automatically renewing the registrations when they knew that, at most, only a small

24   fraction of the free names would be renewed.  VeriSign also overstated revenues and deferred

25   revenue by inflating Network Solutions' deferred revenue when it acquired Network Solutions.

26   Based upon the discovery reviewed, these manipulations resulted in an overstatement of significant

27   revenue, deferred revenue and accounts receivable throughout the Class Period.

28

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES- **C-02-2270-JW(PVT)**      - 23 -

(2) **Improper Revenue Recognition on Roundtrip Transactions, Barter Transactions, and "Up-front" Fees.** VeriSign used the cash it received when it acquired Network Solutions to buy revenues. The Company (i) made cash investments in companies, a portion of which was returned to VeriSign (a requirement for the investment to be made) which it improperly recognized as revenue, (ii) improperly recognized revenues on barter transactions, most of which were done primarily to manufacture revenue (*see, e.g.,* 12/31/01 barter transaction with Phoenix Technologies, (iii) improperly recognized *up-front fees* associated with the sale of trust certificates and other VeriSign products by affiliates, investees and other customers, and (iv) recorded revenue on sales to dozens of non-creditworthy customers where collection was not probable. Numerous documents show that VeriSign scrambled to close these transactions – and improperly recognize revenues – to make their quarterly revenue forecasts throughout the Class Period.

(3) **Investment Accounting.** VeriSign failed to recognize losses associated with its roundtrip investments by improperly accounting for them under the cost method (which did not require VeriSign to recognize its share of the losses incurred by the investee) when GAAP required the equity method (which did require VeriSign to recognize its share of the losses incurred by the investee). VeriSign also failed to write-down its roundtrip and other investments to fair market value to reflect permanent impairment. This aspect of defendants' fraud caused VeriSign's earnings to be overstated by tens of millions of dollars.

(4) **Failure to Reserve for Uncollectible Receivables.** VeriSign also reported inflated financial results by failing to write-off or adequately reserve for uncollectible receivables from dozens of customers with large, severely delinquent balances, including some of the companies VeriSign used for the sham roundtrip transactions. Defendants knew that most of these customers were in financial trouble and that many of the receivables had been past due for one to two years. In fact, many of these receivables were uncollectible from the outset and never should have been recorded as revenue. The failure to adequately reserve for uncollectible receivables caused VeriSign to overstate earnings during the Class Period by tens of millions of dollars.

The documentary evidence, testimony and emails obtained in discovery support Lead Plaintiffs' contention that each of the individual defendants was aware of and participated in the

1  financial manipulations.  Work papers produced by KPMG and other third-parties also confirm the

2  allegations that the defendants engaged in accounting improprieties that caused VeriSign to report

3  materially false and misleading financial results in violation of GAAP, SEC rules and regulations,

4  and the Company's publicly reported accounting policies.

5         Further, defendants managed to sell over $35 million of their VeriSign stock during the Class

6  Period at artificially inflated prices. In short, the evidence received and reviewed to date confirms

7  and strengthens the allegations contained in the SAC and makes this a compelling case.  Lead

8  Plaintiffs and Lead Counsel believe the evidence that defendants violated the federal securities laws

9  by causing VeriSign to issue materially false and misleading financial statements is compelling.

10  **IV.     SETTLEMENT DISCUSSIONS**

11         55.     The parties held several mediations with Hon. Layn R. Phillips (Ret.).  However, the

12  parties were unable to resolve the case and the litigation continued.

13         56.     After the Supreme Court's ruling in *Dura*, and the parties' extensive briefing on the

14  motion for judgment on the pleadings and the subsequent motions to dismiss, the parties convened

15  again informally to explore the possibility of resolving this case.  From mid-2006 through December

16  2006, Lead Counsel, as authorized by the Lead Plaintiffs, and defendants had many arm's length

17  settlement discussions which finally resulted in a settlement that provided for a monetary or

18  significant monetary recovery for the Class.

19  **V.      REASONS FOR THE SETTLEMENT**

20         57.     The settlement must be weighed against the risk of no recovery after contested

21  motions, trial and likely appeals.  While Lead Counsel were prepared to go to trial and were

22  confident about the case, a trial is a risky proposition and Lead Plaintiffs might not have prevailed.

23  Moreover, the claims in this case involve numerous complex legal and factual issues that would

24  require extensive and costly expert testimony.  Among the issues about which the two sides do not

25  agree are: (1) the amount of damages that could be recovered at trial; (2) the method for determining

26  whether the price of VeriSign common stock was artificially inflated during the relevant period; (3)

27  the amount of any such inflation; (4) the extent that various facts alleged by the Lead Plaintiffs were

28  materially false or misleading; (5) the extent that various facts alleged by the Lead Plaintiffs

1   influenced the trading price of VeriSign common stock during the relevant period; and (6) whether

2   the facts alleged were material, false, misleading or otherwise actionable under the securities laws.

3   Additionally, while Lead Counsel is optimistic about the outcome of the pending motion to dismiss

4   the 5AC, there is a possibility that the Court may dismiss the case based on loss-causation grounds.

5       58.    Lead Plaintiffs believe there is compelling evidence showing that each of the

6   defendants violated the securities laws by knowingly or recklessly causing VeriSign to report

7   materially false and misleading financial results.  Further, as defendants repeatedly pointed out, their

8   auditor had reviewed and approved the Company's financial statements.  While failure to restate

9   financial is not fatal to successful prosecution, it does provide defendants the opportunity to trumpet

10  the work of their auditors and creates a risk that a jury might not even find the earlier report results

11  to be false.  If the defendants could successfully focus the jury's attention on the auditors' action, it

12  would not only undercut the proof that the financial statements were false, but would also provide a

13  basis to argue that, even if the reported results were false, the defendants acted without scienter.

14  Again, while I believed that we had strong evidence to overcome this assertion, it was nevertheless a

15  risk to be factored into the evaluation of the case.  Lead Plaintiffs recognize, however, that there was

16  a risk the jury would not agree and find that Lead Plaintiffs failed to prove the state of mind

17  necessary for scienter.  In addition, Lead Plaintiffs recognize that the costs of continuing to litigate

18  the case through summary judgment and trial would increase the costs to the Class and diminish the

19  insurance which was the primary source of recovery should Lead Plaintiffs prevail at trial.  Finally,

20  Lead Plaintiffs also recognize that defendants could appeal any verdict for the Class.

21      59.    At the time of the settlement, defendants' Motion to Dismiss plaintiffs' 5AC was

22  pending.  While defendants conceded that the 5AC, like the TAC, pleads an extensive fraud that

23  satisfies the strict standards of the PSLRA, they disputed that the 5AC sufficiently plead loss

24  causation, and that the allegations concerning the February and March disclosures were insufficient

25  to inform the defendants of the economic loss that the Lead Plaintiffs had in mind.  While Lead

26  Plaintiffs believe they could well have prevailed on the motion, Defendants were just as adamant

27  that Lead Plaintiffs would fail, given the Court's prior orders on *Dura* issues.  Even if Lead Plaintiffs

28  obtained a favorable decision on the pending motion to dismiss, the parties would be engaging in

1  expert discovery and other dispositive motions, fighting over the amount of provable damages

2  caused by defendants' fraudulent scheme.  Thus, there was a risk that the amount of provable

3  damages would be minimized should the case continue to proceed.

4      60.    I believe that because of the risks associated with continuing to litigate and

5  proceeding to trial, there was a danger that the plaintiffs might not have prevailed on any of their

6  claims, in which case the Class would have received nothing.

7      61.    Indeed, throughout this case the Defendants repeatedly asserted that they never made

8  any false or misleading statements or omissions at any time.  In addition, the amount of damages

9  recoverable by the Class, if any, was and continues to be vigorously challenged by the Defendants.

10  If the Litigation were tried, recoverable damages, if any, would have been limited to losses caused

11  by conduct actionable under the laws and, had the Litigation gone to trial, the Defendants intended to

12  assert that all or most of the losses of the Members of the Class were caused by non-actionable

13  market, industry or general economic factors.  The Defendants also would have asserted that

14  throughout the Class Period, VeriSign's business and financial condition were fully and adequately

15  disclosed.

16      62.    Finally, even if plaintiffs prevailed on liability on any of their claims and were

17  awarded damages, there was the significant risk that given the competing legal precedent applicable

18  to the circumstances presented here, Defendants would appeal the verdict and award.  The appeals

19  process would have likely spanned several years, during which time the Class would have received

20  no distribution on any damage award.  In addition, an appeal of any verdict would carry the risk of

21  reversal, in which case the Class would receive no recovery after having prevailed on the claims at

22  trial.

23      63.    After careful review of all these factors, Lead Plaintiffs and Lead Counsel believe this

24  settlement is in the best interests of the Class.

25  **VI.    THE PLAN OF ALLOCATION**

26      64.    The Plan was prepared in consultation with Lead Plaintiffs' damages consultant and

27  reflects Lead Counsel's effort to equitably distribute the settlement proceeds to those Class Members

28  who submit valid claims.

1          65.     Under the Plan set forth in the Notice of Pendency and Proposed Settlement of Class

2   Action, a claim will be calculated as follows:

3              **<u>Claims Related to Open Market Purchases of VeriSign Common Stock</u>**

4          (a)     For shares of VeriSign common stock ***purchased on January 25, 2001***

5   ***through October 25, 2001***, and

6                      (i)     sold on or before October 25, 2001, the claim per share is $0.

7                      (ii)    sold on October 26, 2001 through February 5, 2002, the claim per

8   share is $10.53 (October 26, 2001 Price Decline).

9                      (iii)   sold on February 6, 2002 through March 19, 2002, the claim per share

10  is $13.05 (October 26, 2001 & February 6, 2002 Price Declines).

11                     (iv)    sold on March 20, 2002 through April 25, 2002, the claim per share is

12  $15.75 (October 26, 2001, February 6, 2002 & March 20, 2002 Price Declines).

13                     (v)     held at the close of trading on April 25, 2002, the claim per share is

14  $24.09 (October 26, 2001, February 6, 2002, March 20, 2002 & April 26, 2002 Price Declines).

15         (b)     For shares of VeriSign common stock ***purchased on October 26, 2001***

16  ***through February 5, 2002***, and

17                     (i)     sold on or before February 5, 2002, the claim per share is $0.

18                     (ii)    sold on February 6, 2002 through March 19, 2002, the claim per share

19  is $2.52 (February 6, 2002 Price Decline).

20                     (iii)   sold on March 20, 2002 through April 25, 2002, the claim per share is

21  $5.22 (February 6, 2002 & March 20, 2002 Price Declines).

22                     (iv)    held at the close of trading on April 25, 2002, the claim per share is

23  $13.56 (February 6, 2002, March 20, 2002 & April 26, 2002 Price Declines).

24         (c)     For shares of VeriSign common stock ***purchased on February 6, 2002***

25  ***through March 19, 2002***, and

26                     (i)     sold on or before March 19, 2002, the claim per share is $0.

27                     (ii)    sold on March 20, 2002 through April 25, 2002, the claim per share is

28  $2.70 (March 20, 2002 Price Decline).

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES- **C-02-2270-JW(PVT)**          - 28 -

1            (iii)     held at the close of trading on April 25, 2002, the claim per share is

2  $11.05 (March 20, 2002 & April 26, 2002 Price Declines).

3            (d)     For shares of VeriSign common stock **purchased on March 20, 2002 through**

4  **April 25, 2002**, and

5            (i)     sold on or before April 25, 2002, the claim per share is $0.

6            (ii)     held at the close of trading on April 25, 2002, the claim per share is

7  $8.34 (April 26, 2002 Price Decline).

8         **<u>Claims Related to VeriSign's December 2001 Acquisition of Illuminet</u>**

9       The allocation is based on the Acquisition Price (December 12, 2001 Closing Price of

10  $42.75; the May 9, 2002 Closing Price (the date the lawsuit was filed) of $9.84; and the resulting

11  price difference of $32.91.

12            (a)     For shares of VeriSign common stock **issued pursuant to and acquired in**

13  **VeriSign's December 2001 acquisition of Illuminet**, and

14            (i)     sold on or before May 8, 2002, the claim per share shall be $42.75 less

15  the sales price per share.

16            (ii)     sold on May 9, 2002 through December 8, 2006, the claim per share

17  shall be the lesser of $42.75 less the sales price per share, or $32.91, but in no event shall it be less

18  than $13.56.

19            (iii)     held at the close of trading on December 8, 2006, the claim per share

20  shall be $32.91.

21  **VII.    THE FEE APPLICATION**

22       66.    The Notice informed Settlement Class Members that Lead Counsel intended to apply

23  for attorneys' fees of 25% of the Settlement Fund plus expenses that were advanced in connection

24  with the litigation not to exceed $4.2 million.  As set forth in Plaintiffs' Memorandum of Points and

25  Authorities in Support of Application for Award of Attorneys' Fees and Reimbursement of

26  Expenses, Lead Counsel's request for fees of 25% of the Settlement Fund and expenses of $4.2

27  million, is fair to the Class and fully justified under relevant standards.

28

67.     I believe that under all of the circumstances, Lead Counsel achieved an extremely beneficial result for the Settlement Class.  Throughout the investigation and prosecution, Lead Counsel were unwavering pursuing this case and invested the resources necessary to bring this litigation to a successful conclusion.  All of the factors that should be considered in evaluating fees militate in favor of granting Lead Counsel's request.

A.     **Extent of Litigation**

68.     This case was vigorously litigated.  Under the PSLRA, most of the facts underlying a complaint are developed through investigation without the benefit of court process. It is the success or failure of that investigation that often determines whether the case will withstand motions to dismiss and/or persuade defendants that plaintiffs will eventually prove their case.  Lead Counsel did an extensive job developing the facts that underlie defendants' alleged fraudulent conduct.  After obtaining a favorable order on their motion to dismiss the CAC, Lead Counsel designed an aggressive discovery plan to obtain key evidence in order to prove every element of the case.  From the outset, Lead Counsel's determination to prosecute the case to the fullest extent possible was met by equal determination from opposing counsel whose job was to defend their clients.  Each of the 14 discovery motions contested by the parties resulted from the parties' failure to reach an agreement after a series of meet and confer efforts.  Additionally, Lead Counsel sought to push forward discovery as quickly as possible, and several of these discovery motions were briefed on an expedited basis at the parties' request to the Court.  Additionally, on more than three occasions, over defendants' opposition, Lead Counsel successfully sought to extend the discovery cut-off so that they could gather further evidence to support defendants' alleged fraudulent conduct.  Indeed, this Court took notice of the manner that the case was litigated, as it concluded in certifying the class that "the Lead Plaintiffs appear able to prosecute the action vigorously through qualified counsel." January 13, 2005 Order, at 13.

B.     **The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

69.     This litigation was undertaken by Lead Counsel on a wholly contingent basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy

1   litigation with no guarantee of being compensated for the enormous investment of time and money

2   the case would require.  Indeed, under the PSLRA and in this District in particular, plaintiffs must

3   essentially prove the case in the pleadings.  This requires extensive investigation and cost before

4   plaintiffs know whether a complaint will be sustained. In undertaking that responsibility here, Lead

5   Counsel were obligated to assure that sufficient resources were dedicated to the prosecution of this

6   litigation and that funds were available to compensate staff and for the considerable out-of-pocket

7   costs which a case such as this entails.

8        70.    The foregoing risks and expenses do not even take into consideration the possibility

9   of no recovery.  Not only have tens of thousands of hours been expended in losing efforts in

10  securities cases, but under the PSLRA much of this expense is incurred before the complaint is filed

11  and continues for many months while the legal sufficiency of the complaint is tested.  The factor

12  labeled by the courts as "the risks of litigation" is not an empty phrase and after the PSLRA the risks

13  have increased.  Following the Ninth Circuit's decision in *In re Silicon Graphics Sec. Litig.*, 183

14  F.3d 970 (9th Cir. 1999), a large number of the securities cases filed in this Circuit are dismissed on

15  motions to dismiss for failure to meet the strict pleading standards.  There are numerous cases where

16  plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have

17  received no compensation.  It is only the knowledge by defendants and their counsel that the leading

18  members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the

19  merits and go to trial, that permits meaningful settlements in actions such as this.

20       71.    I believe it is only because defendants believed that Lead Counsel had uncovered

21  substantial evidence and would take this case to trial that they ultimately agreed to pay an amount

22  Lead Counsel consider fair for the Class.  It takes hard and diligent work by skilled counsel to

23  develop facts and theories that will persuade defendants to enter into serious settlement negotiations.

24  If defendants believe they will prevail, they will continue to litigate.

25       72.    Moreover, courts have repeatedly held that it is in the public interest to have

26  experienced and able counsel enforce the securities laws and regulations pertaining to the duties of

27  officers and directors of public companies.  *See Basic Inc. v. Levinson*, 485 U.S. 224, (1988);

28  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, (1985).  Vigorous private enforcement

of the federal securities laws can only occur if private plaintiffs can obtain parity in representation with that available to large corporate interests. If this important public policy is to be carried out, courts must award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

73. When we undertook to act for the Lead Plaintiffs and the Class in this matter, we believed in the case but knew that we would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for our efforts. We were aware that the only way we would be compensated was to achieve a successful result. The benefits obtained for the Class by this settlement are noteworthy in that a settlement of $78.0 million was obtained for the Class, despite the existence of substantial risks and the vigorous defense mounted by defendants.

74. Lead Counsel request a benchmark fee of 25% of the Settlement Fund. This percentage is at or below the range of fees awarded in similar cases and, as explained in the memorandum submitted in support of Lead Counsel's fee application, is fair under all of the circumstances.

## VIII. COUNSEL FOR LEAD PLAINTIFFS' APPLICATION FOR REIMBURSEMENT OF EXPENSES

75. Over and above the significant commitment of time required in this case, counsel for Lead Plaintiffs necessarily incurred out-of-pocket expenses during the course of the litigation. Lead Counsel request reimbursement of $4.2 million for expenses necessarily incurred during the prosecution of the litigation – an amount some $100,000 less than actual expenses.

## IX. CONCLUSION

76. For the reasons set forth above and in the accompanying memoranda, I respectfully submit that: (a) the settlement is fair, reasonable and adequate and should be approved; (b) the Plan represents a fair method for the distribution of the Net Settlement Fund among Class Members and

1  should also be approved; and (c) the application for attorneys' fees of 25% of the Settlement Fund

2  and reimbursement of expenses in the amount of $4.2 million should be granted.

3       I declare under penalty of perjury under the laws of the State of California that the foregoing

4  is true and correct. Executed this 2d day of March, 2007 at San Francisco, California.

5

6

7                                           JEFFREY W. LAWRENCE

8

9  S:\Settlement\Verisign.set\DEC00037597_Lawrence_Set.doc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF APPLICATION FOR FINAL
APPROVAL OF SETTLEMENT & ATTORNEYS' FEES AND EXPENSES- **C-02-2270-JW(PVT)**        - 33 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on March 5, 2007, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7

I further certify that I caused this document to be forwarded to the following designated

8 Internet site at:  http://securities.lerachlaw.com/.

9

10

s/ Joy Ann Bull
JOY ANN BULL

11

12

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

13

655 West Broadway, Suite 1900
San Diego, CA  92101-3301

14

Telephone:  619/231-1058
619/231-7423 (fax)

15

16

E-mail: JoyB@lerachlaw.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:02-cv-02270-JW

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jenniea@lerachlaw.com

- **Randi D. Bandman**
  randib@lerachlaw.com e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

- **Noah Daniel Boyens**
  nboyens@omm.com

- **Patrick J. Coughlin**
  patc@lerachlaw.com e_file_sf@lerachlaw.com

- **Joshua Seth Devore**
  jdevore@cmht.com

- **David Malcolm Furbush**
  dfurbush@omm.com dbrown@omm.com;dshah@omm.com;lnewell@omm.com

- **Marc Lawrence Godino**
  mgodino@glancylaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermanesq.com

- **Dennis J. Herman**
  dennish@lerachlaw.com e_file_sf@lerachlaw.com

- **Jessica Anne Hoogs**
  jhoogs@omm.com

- **Shirley H. Huang**
  shirleyh@lerachlaw.com e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

- **Meredith N. Landy**
  mlandy@omm.com
  dfurbush@omm.com;dbrown@omm.com;lhabbeshaw@omm.com;dedmondson@omm.com;jbake

- **Jeffrey W. Lawrence**
  jeffreyl@lerachlaw.com e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **Ioana Petrou**
  ioana.petrou@usdoj.gov tyle.doerr@usdoj.gov

- **Darren J. Robbins**

- **Mark Wayne Robertson**
  mrobertson@omm.com

- **Lori E. Romley**
  lromley@omm.com dbrown@omm.com

- **Adam T. Savett**
  asavett@cmht.com

- **Shana Eve Scarlett**
  shanas@lerachlaw.com e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com

- **Andrew M. Schatz**
  firm@snlaw.net

- **Christopher Paul Seefer**
  chriss@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;KiyokoF@lerachlaw.com

- **Dhaivat H. Shah**
  dshah@omm.com rbrown@omm.com

- **Alfred Glenn Yates, Jr**
  yateslaw@aol.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Amy Freeman
O'Melveny & Myers
400 S. Hope Street
Los Angeles, CA 90071

Bernard M. Gross
Law Offices of Bernard M. Gross, P.C.
Suite 450, John Wanamaker Bldg.
Juniper & Market Streets
100 Penn Square East
Philadelphia, PA 19107

Nancy A. Kulesa
```

Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103

**Lisa M. Mezzetti**
Cohen Milstein Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500
West Tower
Washington, DC 20005

**Simon Bahne Paris**
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

**Steven J. Toll**
Cohen Milstein Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N. W.
West Tower, Suite 500
Washington, DC 20005-3964

**Mark S. Willis**
Cohen Milstein Hausfeld & Toll PLLC
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC 20005

**VeriSign Manual Service List**

Robert M. Roseman
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
215/496-0300
215/496-6611 (fax)

Arthur L. Shingler III
Scott + Scott LLP
600 B Street, Suite 1500
San Diego, CA 92101
619/233-4565
619/233-0508 (fax)

Objectors

Joseph M. Cafiero
Veronica W. Cafiero
10 Packsaddle Road West
Rolling Hills, CA 90274
310/544-4160

William L. Purdon
11475 Foxhaven Drive
Chesterland, OH 44026
440/729-7295

Lenann T. Engler
Commonwealth of Pennsylvania
Public School Employees' Retirement System
5 North Fifth Street, 5th Floor
Harrisburg, PA 17101
717/720-4687
717/783-8010 (fax)

Joseph J. Indelicato, Jr.
New York State Teachers' Retirement System
10 Corporate Woods Drive
Albany, New York 12211-2395
800/356-3128
518/447-2679 (fax)

Todd Turner
The Turner Firm
1200 Summit Avenue
Suite 800
Fort Worth, Texas 76102
817/878-2700
817/878-2705 (fax)